# KEAN v. CALUMET CANAL AND IMPROVEMENT COMPANY.

### ERROR TO THE SUPREME COURT OF THE STATE OF INDIANA.

No. 8. Argued January 9, 12, 1903.—Decided May 4, 1903.

The common law, as understood by this court, and the local law of Indiana as to the effect of conveyances of land bordering on non-navigable waters are the same.

Where the State of Indiana acquired land from the United States under the Swamp Land Act of September 28, 1850, the patent describing the whole of certain fractional sections enumerated and bordering on non-navigable water between Indiana and Illinois, it acquired all the land under water up to the line of the State, such being the local law of Indiana. The making of a meander line has no certain significance and does not necessarily import that the tract on the other side of it is not surveyed or will not pass by a conveyance of the upland shown by the plat to border on the lake. *Hardin* v. *Jordan*, 140 U. S. 371; *Mitchell* v. *Smale*, 140 U. S. 406, followed.

THE case is stated in the opinion of the court.

*Mr. William P. Fennell* for plaintiffs in error.

Under section 2396, U. S. Rev. Stat., the original survey of 1834 did in fact and in law stop at the " water course."

A survey made by proper officers of the United States and confirmed by the Land Department cannot be shown to be inaccurate by collateral attack in the courts. *Russell* v. *Maxwell Land Grant Co.*, 158 U. S. 253.

The fact that the survey under which the patents issued was contested at every step by the interested parties and was finally decided after six months' consideration by the Secretary of the Interior affirming the decision of the land office affords strong evidence of its correctness and honesty. *United States* v. *San Jacinto Tin Co.*, 125 U. S. 273.

Wolf Lake must be taken as a whole, not in sections. It is a lake between two States.

This case is identical in law and in fact with *Hardin* v. *Jordan*, 140 U. S. 379, only the rule of property is different in In-

diana from what this court assumed to be the law in Illinois. *State* v. *Portsmouth Savings Bank*, 106 Indiana, 459.

The defendant in error must recover on the strength of its own title, just as in *Hardin* v. *Jordan.*

By reference, a plat of a section becomes a part of the conveyance, as much so as if it had been copied into the patent deed. *Piper* v. *Connelly*, 108 Illinois, 646 ; *Louisville & Nashville Railroad Co.* v. *Koelle*, 104 Illinois, 455 ; *McCormick* v. *Huse*, 78 Illinois, 363, citing *McClintock* v. *Rogers*, 11 Illinois, 279,

If defendant in error has not the paramount title to the land in question it is a mere intruder without title.

But the success of appellant in this case does not depend upon a construction of the swamp land act of September 28, 1850. Whether or not that act operated as a grant *in præsenti* to the various States of all the swamp land within their borders is not the question before this court, unless it finds also that the title passed to the appellees as riparian owners, because if appellees have no title to the water, they are mere intruders, and as to them, the patents issued under the new survey are conclusive " that the lands were of the character which by the patents they were represented to be." *Wright* v. *Roseberry*, 121 U. S. 488; *Eberhardt* v. *Hogaboom*, 115 U. S. 67. All presumptions are to be indulged in support of proceedings upon which a patent is issued, and the patent is not open to collateral attack in an action of ejectment or to quiet title. *Eberhardt* v. *Hogaboom*, 115 U. S. 67 ; *The Iowa Railroad Land Company* v. *Antoine*, 52 Iowa, 429.

Riparian rights have nothing to do with the title to land under the water. *Diedrich* v. *The N. W. Ry. Co.*, 42 Wisconsin, 262.

It was evidently the intention of both the National and state governments to convey the border lands to the edge of the pond, and according to the general rules of conveyancing if there is a discrepancy between the meander line as indicated on the map and the actual water line, the natural monument which was intended by the parties to be the boundary, would be the boundary and not the artificial meander line.

Nothing could be clearer than that the Indiana Supreme Court has held in this case that the deeds of the border lands did not convey the bed of the lake to defendant in error. And the court is not the less explicit upon the question of riparian rights. *State of Indiana* v. *Milk*, 11 Fed. Rep. 389; *Boorman* v. *Sunnuchs*, 42 Wisconsin, 233; *State* v. *Gilmanton*, 9 New Hampshire, 461; *Seaman* v. *Bis*, 24 Illinois, 521; *Fletcher* v. *Phelps*, 28 Vermont, 257; *Mansur* v. *Blake*, 62 Maine, 38; *Wheeler* v. *Spinola*, 4 New York, 377; Angell on Water Courses, section 41.; *Paine* v. *Wood*, 108 Massachusetts, 160; *Diedrich* v. *North- Western Ry. Co.*, 42 Wisconsin, 248.

The action of the Land Department in issuing a patent is conclusive in all courts and in all proceedings where by the rules of law the legal title must prevail. *Johnson* v. *Towsley*, 13 Wallace, 83; *Warner* v. *Van Brunt*, 19 Wallace, 653; *Shepley et al.* v. *Cowan et al.*, 91 U. S. 340; *Moore* v. *Robins*, 96 U. S. 530; *Marquez* v. *Frisbie*, 101 U. S. 473; *Vance* v. *Van Brunt*, 101 U. S. 519; *United States* v. *Schurz*, 102 U. S. 401; *Smelting Company* v. *Kemp*, 104 U. S. 646; *State* v. *Smelting Company*, 106 U. S. 447; *Quinn* v. *Conlon*, 104 U. S. 421; *Baldwin* v. *Stark*, 107 U. S. 465; *Cornell* v. *Lammers*, 21 Fed. Rep. 200; *Cragin* v. *Powell*, 128 U. S. 593; *Gazzam* v. *Lessee of Elam Phillips et al.*, 20 How. 374.

Land cannot pass as appurtenant to land.

In *Child* v. *Starr*, 4 Hill, 396, it is held: "A conveyance of one acre of land can never be made by any legal construction to carry another acre by way of incident or appurtenance to the first." Such is the doctrine laid down in 2 Met. 147; 8 Met. 260; 10 Pet. 25; 15 John. 447.

If this were an action of ejectment it would be barred by the statute of limitation on account of the twenty years' adverse possession. *Vandugan* v. *Hepner*, 45 Indiana, 589. But this being a suit to quiet title is barred by the fifteen years' statute. *Caress* v. *Foster*, 62 Indiana, 145; *Milner* v. *Hyland*, 77 Indiana, 458.

That unnavigable lakes and ponds have always had a legal status distinguished from swamp lands, see Huberus, Book 2, tit. 1, par. 25, p. 104; 1 Huber. Book 2, tit. 1, par. 25, p. 104;

Roman Law, Digest, Lib. 41, tit. 1, De aq. A. R. D., section 12; Callistratus, Lib. 2, Institutes; Ulpian, Digest, Lib. 43, tit. 14, sec. 4; French Law, section 1566, arts. 556, 558, Code Civ.; Traite du Domaine Publique Français; Treatise of Proudon & Dumay on the Public Domain of France, Book 4, § 1566; Barrett's Code Napoleon, § 558; German Law, Frederican Code, § 35, Book 1, art. 7, p. 45; Bracton, Ed. 14, 1569, Book 2, chap. 2, p. 2, fol. 9; Fleta, Lib. 3, chap. 2, §§ 8, 9; Lib. 3, chap. 2, p. 8; Grotius, Lib. 2, chap. 3, §§ 9, 16; chap. 8, § 12; 1 Huberus, 123, § 33, and p. 104; Roman Civil Law, Dig. Lib. 41, tit. 1, § 16; Heinnecius Jus. Nat. & Gen. Lib. 1, chap. 9, § 25; Heinnecius Elementa Juris. Lib. 2, tit. 1, § 358.

*Mr. Frederick S. Winston*, with whom *Mr. James F. Meagher*, *Mr. Silas H. Strawn* and *Mr. G. E. Hamilton* were on the brief, for defendent in error.

I. The Supreme Court of Indiana, having held that all of the land involved in this suit was in fact included in the survey of 1834–35, this court will not disturb that finding of fact. *Gardner* v. *Bonestell*, 180 U. S. 362; *Egan* v. *Hart*, 165 U. S. 188; *Dower* v. *Richards*, 151 U. S. 658; *Hedrick* v. *A., T. & S. F. R. R.*, 167 U. S. 673; *Republican River Bridge Co.* v. *Kansas Pac. R. R.*, 92 U. S. 315.

The Supreme Court of Indiana, not only in the opinion in the case at bar, but also in the opinion of *Kean* v. *Roby*, 145 Indiana, 221, has held, *as a matter of fact*, that all of the land in question was surveyed by the Federal Government in 1834–35.

II. All of the land in question having been included in the survey of 1834–35, the United States having conveyed it all under that survey to the State of Indiana in 1853, and defendant in error holding under mesne conveyances from the State, by the same description, the survey of 1875 was void, and plaintiffs in error acquired no rights thereunder, as held by the Supreme Court of Indiana in *Kean* v. *Calumet Canal & Improvement Co.*, 150 Indiana, 699; *Kean* v. *Roby*, 145 Indiana, 221; following *Tolleston* v. *State*, 141 Indiana, 197, and as held by this court in *Hardin* v. *Jordan*, 140 U. S. 371, and *Mitchell* v. *Smale*, 140 U. S. 406. See also *Davis* v. *Wiebold*, 139 U. S. 507.

The facts in the case at bar are much more favorable to the
defendant in error than were the facts in the *Hardin* and *Mitch-
ell* cases to the prevailing party in those cases. Here we
have a finding by the Supreme Court of Indiana that, as a mat-
ter of fact, all the land in question, whether in the bed of the
lakes or elsewhere, was actually surveyed in 1834–35. More
than that, the defendant in error in our case holds under a pat-
ent from the Federal Government all the land in question,
made pursuant to and after the passage of the swamp act in
1850, while Hardin holds under a patent issued by the Govern-
ment in 1841, prior to the passage of the swamp act. In this
case, also, there is no question of any interest of the State or
of the United States in and to the land in question. And that
is just as true with respect to the land in the beds of Wolf Lake
and Lake George as it is with respect to the upland. On this
point see further, *Moore* v. *Robbins*, 96 U. S. 530; *Smelting Co.*
v. *Kemp*, 104 U. S. 640; *Wright* v. *Roseberry*, 121 U. S. 488;
*Doolan* v. *Carr*, 125 U. S. 618.

We therefore say that the cases cited by the plaintiffs in er-
ror, upon the proposition that the decision of the Secretary of
the Interior is *res adjudicata*, are not in point.

III. The rights of the owners of land bordering on inland
non-navigable lakes are settled by the law of the State wherein
the land lies.

This principle has been so frequently laid down by this court
that we believe any extended comment superfluous. Notwith-
standing the difference of opinion in the *Hardin* and *Mitchell*
cases upon other points, the court has always been unanimous
on this question.

Since the decisions in the *Hardin* and *Mitchell* cases this
court has repeatedly reaffirmed that doctrine, particularly in
the cases of *Lowndes* v. *Huntington*, 153 U. S. 1, 19; *Grand
Rapids & Indiana R. R. Co.* v. *Butler*, 159 U. S. 87; *Water
Power Co.* v. *Water Commissioners*, 168 U. S. 349, 363.

IV. What then is the law of the State of Indiana respecting
non-navigable lakes, and particularly respecting Wolf Lake
and Lake George?

In *Ross et al.* v. *Faust et al.*, 54 Indiana, 471, decided in

1876, the court held that the title of riparian proprietors on White River, in said State, extended to the thread of the stream, regardless of the facts that the survey lines of the United States surveyors meandered the banks and did not include the bed thereof, and that such bed was not, in terms, sold to, nor paid for by, purchasers of the lands bordering on such river. See also *Ridgway* v. *Ludlow*, 58 Indiana, 248; *Edwards* v. *Ogle*, 76 Indiana, 302; *State* v. *Portsmouth Savings Bank*, 106 Indiana, 435; *Tolleston Club of Chicago* v. *State*, 141 Indiana, 197; *State of Indiana* v. *Milk*, 11 Fed. Rep. 389; *Stoner* v. *Rice*, 121 Indiana, 51; *Brophy* v. *Richeson*, 137 Indiana, 114; *Tolleston Club of Chicago* v. *Clough*, 146 Indiana, 93; *Kean* v. *Roby*, 145 Indiana, 221.

It appears therefore to be the settled law in the State of Indiana that, where an inland non-navigable lake covers a subdivision of land and the government survey designates the dry land in such subdivision as a fractional subdivision, or lot, the purchaser from the Government of such subdivision or lot takes the title to all that portion of the bed of the lake contained within the subdivision. That is to say, he takes as a riparian owner, his title includes, and he owns, the land beneath the lake far enough beyond the meander line and water's edge to make out the full subdivision in which his land is so situated. The decision in this case is the latest expression of the Supreme Court of that State, and is in no sense *dictum*. *Wade* v. *Travis County*, 174 U. S. 499. See also *Leffingwell* v. *Warren*, 2 Black, 599; *Fairfield* v. *Gallatin County*, 100 U. S. 47.

V. If the common law of Indiana were as found by this court, in *Hardin* v. *Jordan*, to be the common law of Illinois, then the defendant in error, as a riparian owner of bordering lands, owns to the center of the lakes, and, consequently, all of the land in controversy.

For the sake of the argument, let us assume, contrary to the fact, that the survey made in 1834–35 of township 37 north, range 9, and township 37 north, range 10, did not include Wolf Lake and Lake George. Then we submit that, under the rule of the common law, as stated by this court in *Hardin* v.

*Jordan,* defendant in error, as the owner of the land bordering on these lakes, would take to the center thereof. *Forsythe* v. *Smale,* 7 Biss. 201 ; *Fuller (Hardin)* v. *Shedd,* 161 Illinois, 462.

VI. Counsel for plaintiffs in error would impose upon this court the burden of examining the record to ascertain whether or not the defendant in error in the prosecution of this suit is barred by the statute of limitations of the State of Indiana. This was a question of fact, which has been decided adversely to the plaintiffs in error, both by the *nisi prius* and the Supreme Courts of the State of Indiana.

If this court would go into the record to determine this question, its conclusion must necessarily, we submit, affirm that of the state courts. A jury was waived, the case tried before the court, and the finding and judgment of the trial court having been affirmed by the state Supreme Court, the question as to whether or not the defendant in error complied with the statute of limitations of the State of Indiana cannot be here reviewed. It is not a Federal question. *Gardner* v. *Bonestell,* 180 U. S. 362, 370 ; *River Bridge Co.* v. *Kansas Pacific Ry. Co.,* 92 U. S. 315 ; *Dower* v. *Richards,* 151 U. S. 658 ; *Egan* v. *Hart,* 165 U. S. 188 ; *Hedrick* v. *A., T. & S. F. R. R.,* 167 U. S. 673 ; *Murdoch* v. *City of Memphis,* 87 U. S. 590.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is a proceeding to quiet title brought by the Calumet Canal and Improvement Company in a court of the State of Indiana. The company got judgment, which was affirmed by the Supreme Court of the State, 150 Indiana, 699, and the case is brought here by writ of error. The land in question is land bordering on and extending under certain non-navigable water up to the state line, the Illinois side of which was the subject of the decisions in *Hardin* v. *Jordan,* 140 U. S. 371, and *Mitchell* v. *Smale,* 140 U. S. 406. But the facts in this case are somewhat different. The Calumet company claims title through mesne conveyances from the State of Indiana. The State of Indiana got its title under the Swamp Land Act, September 28, 1850, c. 84, 9 Stat. 520 ; Rev. Stat. §§ 2479 *et seq.,* and patents

of the United States dated 1853, purporting to be in pursuance of that act, and referring to the official plat of survey, which was made in 1834. The patent set forth describes " the whole of fractional sections " enumerated and bordering on the water, in which sections lies the disputed land. The State afterwards conveyed by the same description. It is not denied that the company got the land above the water line, as shown in the plat referred to, but it is denied that it got more. The water has been receding and drying up, so that the question is important. The defendant set up a later survey in 1875 of the land which was covered by water in 1834, and is covered, to a less extent, still, and patents from the United States in pursuance of the same, for tracts below the original water line. They deny that the State ever owned this land, or, if it did, that it conveyed it, and they allege the later survey to be conclusive.

On general principles of conveyancing the State would have acquired the land in controversy here by a conveyance from the United States describing the upland according to the survey, because the local law of Indiana and the common law as understood by this court are the same, so far as this case is concerned. *Stoner* v. *Rice,* 121 Indiana, 51 ; *Hardin* v. *Jordan,* 140 U. S. 371. The case is stronger if the land passed under the Swamp Land Act, as has been held by the state court with regard to this and similar patents. *Mason* v. *Calumet Canal & Improvement Co.,* 150 Indiana, 699 ; *Kean* v. *Roby,* 145 Indiana, 221 ; *Tolleston Club of Chicago* v. *Clough,* 146 Indiana, 93 ; *Tolleston Club of Chicago* v. *State,* 141 Indiana, 197. See *Mitchell* v. *Smale,* 140 U. S. 406, 414.

The making of a meander line has no certain significance. *French-Glenn Live Stock Co.* v. *Springer,* 185 U. S. 47, 52. It does not necessarily import that the tract on the other side of it is not surveyed or will not pass by a conveyance of the upland shown by the plat to border on the lake. It is not always a boundary. *Railroad Co.* v. *Schurmeir,* 7 Wall. 272 ; *Hardin* v. *Jordan,* 140 U. S. 371, 380 ; *Mitchell* v. *Smale,* 140 U. S. 406, 414 ; *Horne* v. *Smith,* 159 U. S. 40, 43 ; *Grand Rapids & Indiana Railroad* v. *Butler,* 159 U. S. 87, 93. In this case its immediate import was only to indicate the contour of the lake. It would

seem, to be sure, that the settled understanding of the land department has been that in cases like the present the meander line marked the limit of the grant. But probably the cases are comparatively rare in which that understanding was acted on by an attempt subsequently to convey the land under water on the further side of the line at dates before the transactions with which we have to deal. The title to such land was not considered of much importance in the early days or worth the trouble of an independent survey. See *Newsom* v. *Pryor*, 7 Wheat. 7, 11. The United States was more anxious for settlers than for revenue from that source. It is not necessary to consider how we should decide the case with our present light if the question were a new one. It is not new. For twelve years the decisions in *Hardin* v. *Jordan* and *Mitchell* v. *Smale* have stood as authoritative declarations of the law. Probably in most cases the statute of limitations has cured the defects of title which those cases may have shown. Meantime many titles must have passed on the faith of those decisions. The United States can meet them by the form of its conveyances. It seems to us that it would be likely to do more harm than good to allow them to be called in question now.

It is said that the land under water was not embraced in the survey of 1834. It would seem from the plat and the field notes that the sections and dividing lines were clearly marked off and posts set. The case is similar to *Kean* v. *Roby*, 145 Indiana, 221, where the survey was pronounced sufficient. No difficulty was felt on the ground that the survey did not cover the submerged land in *Hardin* v. *Jordan,* 140 U. S. 371. But furthermore, the land was selected as "swamp and overflowed lands" by the State. It not appearing otherwise, the selection must be presumed to have included the land overflowed, and if so it was confirmed to the State by the act of March 3, 1857, c. 117, 11 Stat. 251; Rev. Stat. § 2484. The confirmation encounters none of the difficulties of cases like *Stoneroad* v. *Stoneroad,* 158 U. S. 240. The land surrounding the water, at least, was surveyed, so that the identification of the submerged portion was absolute. We are of opinion that the State of Indiana got a title to the whole land in dispute.

If the State of Indiana got a title, it gave one. There is not much controversy on this point. We should follow the decision of the state court in this case so far as this question is concerned, if there was no other evidence of the state law. But the law of Indiana is shown by the other cases cited above to be clear on this point.

The resurvey by the United States in 1874 does not affect the Calumet company's rights. As the United States already had conveyed the lands, it had no jurisdiction to intermeddle with them in the form of a second survey. *Hardin* v. *Jordan,* 140 U. S. 371, 400; *Grand Rapids & Indiana Railroad Co.* v. *Butler,* 159 U. S. 87, 94, 95; *Railroad Co.* v. *Schurmeir,* 7 Wall. 272, 289.

Of course, we shall not undertake to revise the finding of the state courts that the statute of limitations had not run in favor of the plaintiffs in error, and that, if any one is to profit by it, the Calumet company would prevail.

*Judgment affirmed.*

Mr. Justice White, with whom concurs Mr. Justice Mc-Kenna, dissenting.

The importance of the question which this cause involves and the far reaching and injurious consequences which, in my opinion, must arise from the continued application of what seems to me to be the erroneous theories upon which it is now decided, not only constrain me to dissent, but cause me to state fully the reasons by which I am controlled.

The controversy is between opposing claimants to lands once a part of the beds of certain non-navigable bodies of waters, styled lakes—and which shall be hereafter referred to by such designation. Both parties asserted title under patents of the United States.

In 1834 surveys were made by the United States of townships 37 north, in ranges 9 and 10 west, second principal meridian, lying in Lake County, in the extreme northwestern portion of the State of Indiana. Township 37 in range 9 was bounded on the west by township 37 in range 10, and the latter was bounded on the west by the State of Illinois. From

the eastern boundary of township 37 in range 10 there was less than a mile intervening to the Illinois boundary on the west. In consequence, the sections or fractional sections appearing on the plat of survey of that township were only the extreme easterly tier of sections, being those numbered 1, 12, 13, 24, 25 and 36. A copy of a portion of the government plat of survey of the townships named, in which are embraced the lands whose title is in dispute, is inserted for convenience of reference on opposite page.

The easterly of the two bodies of water, lying partly in both townships, is known as Lake George or Mud Lake. The westerly body is called Wolf Lake. As shown by the plat, the lines of survey were not actually run across the water of the lakes, and, consequently, no attempt was made to subdivide the lands in the then beds of the lakes into legal subdivisions. The lines of survey were in fact run around the rim of each lake, and the fractional lots resulting from the meander line were given numbers, as was customary in such cases.

The land about the margin of the lakes was very flat, and the average depth of water at the time of the surveys was conjectured to be about five or six feet.

None of the fractional lots abutting on the two lakes in the townships in question had been disposed of by the United States prior to the passage of the swamp land act of September 28, 1850. Thereafter, the State of Indiana transmitted a list of lands which it desired should be patented to the State under said act, and the list embraced the portions of the townships in which Wolf Lake and Lake George were situated. This list, however, referred only to entire sections, took no note of the plat of survey and made no reference to the fractional lots abutting on the lakes or the other subdivisions of sections. In the approved list of selections made by the Secretary of the Interior the general description of the lands as given in the state lists was followed, except that where by the meander line shown on the plat of survey it appeared that a section was made fractional, the section was termed a fractional section, and the quantity of land shown on the plat to be contained in each minor subdivision or fractional section was specifically stated.

A patent dated March 24, 1853, was issued to the State of Indiana for the approved selections. The mode in which the lands were described in the patent is illustrated in the following excerpt:

"Also, the whole of fractional sections one, twelve, thirteen and twenty-four, the north half of the southeast quarter, the southeast quarter of the southeast quarter and the northeast quarter of section twenty-five and the whole of fractional section thirty-six all one thousand seven hundred and ninety-one acres and sixty-hundredths of an acre.   .   .   ."

After the description of the lands was the following:

"According to the official plats of survey of the said lands returned to the General Land Office by the surveyor general."

Soon after acquiring title in this manner to the border lots, the State of Indiana conveyed them, by the plat numbers, to private individuals.

While the record does not show the causes which led to the drying up of the beds of the two lakes within the meander lines on the plats of surveys of 1834, it is nevertheless certain that about the year 1874 the waters of these lakes had in great part disappeared. In the years 1874 and 1875 various persons settled on the uncovered lands referred to, with the intent of acquiring title under the homestead law. Application was made to the Interior Department for a survey thereof. In virtue of this application, a survey was made in 1875—known as the Walcott survey—and a plat was drawn exhibiting the subdivisions thereof. The confirmation of this survey was resisted in the Land Department by one who had acquired title to border lots from the State of Indiana, on the ground that the United States had no land to survey in the beds of the lakes, as the effect of the conveyance by the United States to the State had been to pass title to the beds of the lakes. This controversy before the Land Department was finally disposed of on February 23, 1877, by the Secretary of the Interior, in favor of the validity of the Walcott survey. Thereafter patents for the lands in the beds of the lakes covered by the survey were issued by the United States.

In 1895, the Calumet Canal and Improvement Company brought an action in the Lake Circuit Court of Indiana, to

quiet its asserted title to certain of these border lots and its alleged title as riparian owner to land in front thereof, once part of the beds of the lakes, and, upon a second trial of the action, obtained judgment.   On appeal, the Supreme Court of Indiana affirmed the judgment, and the cause was then brought to this court on a writ of error prosecuted by claimants under the Wolcott survey, based upon the contention that the decision of the Supreme Court of Indiana was against a title and right specially set up "under the statutes, patents, deed of conveyance and authority of the United States of America." In deciding against the validity of the Wolcott survey and the patents to land in the beds of the lakes based on such survey the Supreme Court of Indiana said (p. 699) :

"In 1875, certain persons, under the assumption that the beds of the lakes had not been surveyed in 1834, procured a resurvey of that part of the lands formerly covered by the waters ; and it is through this last survey, and the sales made in pursuance thereof, that appellants claim title.   The case before us, therefore, in so far as concerns source of title, does not differ from that of *Kean* v. *Roby,* 145 Indiana, 221.   On the authority of the decision in that case, there can be no question that the resurvey of 1875, as also the sales made thereunder, were wholly invalid, and, consequently, that appellee's title, as based upon the original survey of 1834, and the sales made under that survey, is good.   No real distinction in this regard has been shown between the two cases."

It becomes necessary, therefore, to refer to the case of *Kean* v. *Roby,* upon which the Supreme Court of Indiana rested its conclusion.   As, moreover, the comprehension of the doctrines involved in that case necessitates a consideration of the course of previous decisions in Indiana relative to the subject involved, I shall review the Indiana cases preceding *Kean* v. *Roby,* in order, as far as may be, to an exact elucidation of the legal principles by which the decision of this case was below controlled.

*Ross* v. *Faust,* (1876) 54 Indiana, 471, involved the title to land under the bed of a non-navigable river.   The land abutting on the stream had been surveyed and the stream had been

meandered.   The question was whether patents of the United States conveyed land under water within the meander lines. Determining the construction of the patent solely by reference to the laws of the United States, the court decided that, as the stream was in fact non-navigable, the holder of the patent to the border lots had title to the center of the stream despite the meander line.

*Ridgway* v. *Ludlow*, (1877) 58 Indiana, 248, involved a controversy respecting the ownership of land once forming part of the bed of a non-navigable lake.   The land bordering on the lake had evidently been acquired from the United States and the lake had been meandered.   The rule in *Ross* v. *Faust* was applied, the court saying :

"We can see no difference in principle in this rule, whether applied to non-navigable rivers or non-navigable lakes, when they are within the Congressional surveys."

*Edwards* v. *Ogle*, (1881) 76 Indiana, 302, presented the following state of facts : On a plat of survey of a section of land, which was in great part covered by the waters of a pond, the banks of the pond were shown as meandered, but the lines of the sections, half sections and quarter sections were extended across the pond by dotted lines.   A fractional portion of the southwest quarter, represented as containing 39 acres—the dry land outside of the meander—was patented by the United States in 1845.   In 1851 the United States, under the swamp land act, executed to the State of Indiana a patent for the east half of the southwest quarter, being within the meander line.   In 1858 the United States issued a patent to one Ogle for the west half of the same quarter section.   Edwards, as owner of the thirty-nine acre tract, asserted a right to the center of the pond, which if allowed would have absorbed the land claimed by Ogle.   Edwards was confined to the actual quantity of land specified in the patent.   *Ross* v. *Faust* was distinguished, the court remarking of that case : " The bed of the river had not been surveyed as a part of the public domain, but, on the theory that White River was a navigable stream, the government surveys had been terminated at the margin thereof."

*State* v. *Portsmouth Savings Bank*, (1886) 106 Indiana, 435,

459, involved the question whether conveyances of fractional lots bordering on Beaver Lake, in Newton County, Indiana, passed title to land under the bed of the lake.  The controversy was between the State claiming the bed of the lake and certain private individuals who deraigned title from the State, claiming that as the State had transferred to them rights derived under patents from the United States, their rights were coterminous with the patent and extended across a meander line to the center of the lake.  Beaver Lake was a body of water covering about seventeen thousand acres of land, and averaging from five to seven miles in length and from two to four miles in width.  The border lands had been surveyed in 1835 by authority of the United States, and were subject to private entry.  In making the survey the same was extended around the lake and a meandering line established.  As a necessary result of the meander line fractional lots were shown on the plat around the margin of the lake.  Under the swamp land act the border lands, by the government subdivisions, were selected by the Secretary of the Interior and patented to the State of Indiana.

The Supreme Court of Indiana declared that it was not necessary " to determine whether the patents of the United States to the State for the fractional lots bordering upon and surrounding the lake, being grants from one government to another, by their own force carried the bed of the lake. "  Reviewing previous decisions of this court, construing the swamp land act, the Indiana court held that that act was a grant *in præsenti.*  It was further held that, although the bed of Beaver Lake was not embraced in the list of selections made by the State, yet by the acts of its officials, immediately after the grant to it of the border lands, the State had treated the bed of the lake as swamp and overflowed land, and constructively selected the same, and that an act of Congress, approved January 11, 1873, 17 Stat. 409, releasing and quitclaiming the bed of Beaver Lake to the State of Indiana, did not operate as a grant, but simply as a confirmation of the prior selection, thereby perfecting the title as indefeasible.

The court came next to consider the claims of the grantees of the State of border lots, described in the patent from the

State according to the plat of survey which had been made by the United States. It was declared that state patents for border lots must be construed with reference to the power conferred upon state officials by the state law, and not by the rule, which would govern a conveyance by a private individual; and applying this rule, it was held that the patents for border lots carried to the grantees "no more of the swamp and overflowed lands than were included in the several surveyed subdivisions *bounded by the lake*."

*Stoner* v. *Rice*, (1889) 121 Indiana, 51, was a controversy between owners of border lots as a meandered non-navigable lake claiming under patents of the United States and patentees of the United States under a subsequent survey of the bed of the lake. Despite its previous ruling in *Ridgway* v. *Ludlow, supra*, it was now held that the rule giving a riparian owner of fractional lots abutting on a meander line title to the thread or center of the stream, was not applicable. The case was decided upon what the court assumed to be the law of the United States governing surveys of the public domain, the court said (p. 54):

"The true doctrine to apply, in the disposition of such land as is covered by the body of such lakes, we think, is that the government in making surveys included in such surveys all the land within the district surveyed, and if there was a lake or large pond which covered a part of a subdivision, it was meandered out, and the dry land in such subdivison designated as a fractional subdivision, or lot; that in the purchase of such fractional subdivision, or lot, the purchaser took title to it as a riparian owner, with the right to the land as the water receded within the boundary lines of the subdivision conveyed to the purchaser. In other words, the purchaser acquired title to all the land within the subdivision, though it was described as a fractional subdivision, or lot. The authorized survey divided all the land within the district into subdivisions, and if, by reason of water upon a tract of the land, a portion of it was regarded at the time as worthless and unsalable, there was a meander line run to ascertain the amount of dry land, and such subdivision was designated as fractional subdivision, or lot, and although thus described the sale passed title to the whole subdivision."

The court declared that the doctrine thus announced by it was not in conflict with its previous ruling in *Edwards* v. *Ogle.*

*Brophy* v. *Richeson*, (1894) 137 Indiana, 114, was a contest between the patentees of a fractional tract of dry land termed the southeast fractional quarter of a certain section, lying north and east of a meandered lake, and the patentees under a later survey made by the United States of the bed of the lake. It was held—following *Stoner* v. *Rice*—that the claimant under the first patent took title to all the land within the quarter section, whether dry or covered by the waters of the lake.

*Tolleston Club* v. *State,* (1894) 141 Indiana, 197, was an action brought by the State of Indiana for the recovery of lands within the meander lines of a United States survey. The claim was that the State had acquired title to the lands within the meander upon selections made under the swamp land act of certain land, for which patents of the United States had been issued to the State of Indiana in 1853. Although the State had conveyed the border lots which she had acquired from the United States, the theory of the claim of the State was that, despite this conveyance, she remained the owner of and was entitled to recover the land within the meander, because it was deemed, in accordance with the ruling in the *Portsmouth Bank* case, (involving Beaver Lake,) that the State, in transferring the border lots, by their designation on the government plat of survey, had retained to herself and not conveyed her title to the land under water. The defendants asserted title derived from the United States under patents issued subsequent to 1870, based upon a survey made of the bed of the water by reason of an act of Congress, which is excerpted in the margin.[1]

---

[1] Act approved July 1, 1870, 16 Stat. 187.

Chap. CXCIX.—An act in relation to certain unsold lands in the counties of Porter and Lake, in the State of Indiana.

Whereas there is lying along the Little Calumet River, in the counties of Porter and Lake, in the State of Indiana, a body of lands supposed to contain about four thousand acres, which has never been sold or surveyed, and which was described in the original government surveys as impassable morass ; and whereas the Calumet Draining Company has been organized under the laws of said State, for the purpose of draining the valley of said river including said morass : Therefore,

It suffices to remark that it was held that, although the United States survey showed a meander line and fractional lots or sections thereon, that this meander line, under the laws of the United States, was not a boundary, because, under said laws, its sole purpose was, not to limit the survey in any way, but simply to indicate how much dry land there was in the subdivision purchased. Consequently, it was determined that the land, both dry and wet, should be treated as having been wholly surveyed, because the lines of survey might be protracted across the meander so as to make complete surveyed sections, embracing both the dry and the wet land. The enumeration in the plat of the quantity of land contained in the subdivisions of the sections was considered as immaterial, and the doctrine of *Stoner* v. *Rice* was applied.

Whilst the claims of the patentees under the subsequent United States survey of the land within the meander was therefore rejected, and the act of Congress directing the survey was decided to be void, it was yet held that, as the State must recover upon the strength of her own title, she was not entitled to judgment for any land within the meander lines, because the grants made by the State of the fractional lots passed title to the legal subdivision beyond the meander lines, upon the theory of survey above noticed and the controlling effect of the decision in *Stoner* v. *Rice*. A petition for rehearing was filed on behalf of the State. An opinion denying such rehearing is reported in 141 Indiana, 214. The principal contention on behalf of the State was that "the court erred in holding that the land in controversy had been surveyed either by the government of the United States, or by the State of Indiana, at the time of the

---

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That said unsold lands shall be subject to a lien under the laws of the State of Indiana for its proper proportion of the cost of such drainage, and such lien may be enforced against said lands in the same manner and to the same extent as if the said lands were owned by private persons. : *Provided,* That no claim shall be held to exist against the United States for such drainage.

SEC. 2. *And be it further enacted,* That said lands may be surveyed and sold to the highest bidder, under the directions of the Secretary of the Interior, subject to said lien.

sale of such border lots by the State." The court, however, observing that this contention was dangerous ground for the State to stand upon, considered at length the provisions of sections 2395 and 2396 of the Revised Statutes of the United States, and concluded as follows :

" The land in controversy was therefore surveyed into sections, as provided by law, by the United States government surveyors, in 1834. But even if we were mistaken in this, it would, as we have said, be a dangerous contention for appellee to undertake to show that such survey was not made. The swamp land act of 1850, under which the State claims title, requires that the lands should be selected, and the selections approved by the Secretary of the Interior, as swamp lands. The land in dispute consists of parts of surveyed sections of land, selected, approved and certified from the General Land Office of the United States. The land so selected is described as in ' township No. 36, range 8 west,' and being ' all of . . . [sections] 12, 15, 17, 18, 19 and 20. All of 21 and 22 [and] N. W. $\frac{1}{4}$ 23.' But if there were in fact no survey, then no such sections would exist, at least between the meanders of the Calumet River and so no selections would ever have been made by the State or approved by the Secretary of the Interior. The consequence would be that the State had never received title, and the unsurveyed lands having remained in possession of the general government, were correctly surveyed, and sold under the act of Congress of 1870. If, therefore, we should admit this main contention of counsel for appellee, the consequence would inevitably follow that the State had never acquired title to the land in dispute. We are satisfied, however, that the conclusions reached in the original opinion—that the lands were surveyed in 1834 ; that they were selected, and the selections approved, under the swamp land act of 1850 ; that the State, therefore, acquired good title under that act ; and that the act of 1870, with the resurvey and sales thereunder, was a nullity—are all correct ; and we are quite unable to understand why counsel should here insist upon a contention which, if agreed to, would cut the ground entirely from under their own feet."

The *Portsmouth Savings Bank* case was distinguished by

the statement that "Beaver Lake was a large body of water, of shallow depth, which had not been surveyed by the United States government."

The precise import of the doctrine which, following *Stoner v. Rice,* the court applied in the case just reviewed is so aptly portrayed in the case of *Tolleston Club* v. *Clough,* 146 Indiana, 93, that it is here noticed out of its chronological order. The plaintiff commenced his action to quiet title to land derived from the State through patents issued to the State by the United States under the swamp land act. The lands in controversy were part of those which were involved in the case of *Tolleston Club* v. *State, supra.* The exact situation of the lands is shown on the following plat which is reproduced from the opinion of the Supreme Court of Indiana:

To convey a clear conception of the situation and character of the land, a passage is here excerpted from the opinion in *Tolleston Club* v. *State, ub. sup.:*

"The lands claimed by the State are within the meander lines of the United States survey on each side of the Little Calumet River, being a tract about six miles in length and from about three quarters of a mile to about a mile and a quarter in width. In the original field notes of the survey the region is referred to as a 'lake,' while on the plat it is marked 'Impassable Marsh.' At the time of the United States survey, in 1834, the territory was completely covered with water, in which, outside the river proper, there was a heavy growth of cat tails, wild rice and other swamplike products."

The plaintiff, deriving title from the patents of the United States covering the fractional lots outside of the meander line, claimed to be the owner of the marsh land inside of the meander up to the thread of the stream marked on the plat as a river.

The court followed its ruling in *Tolleston Club* v. *State*, and said :

"It is plain that the lots described, being lot one and parts of lots two and three, in section 19, and lots one, two, three and four, in section 20, all extend north to the north section lines of their respective sections."

By this ruling the lots abutting on the meander were made to cross that line, embrace the marsh land lying between them and the river, and would have extended across the river, so as to include practically the entire river in those sections, except where in the sinuosity of the river it crossed the section line. As, however, the court found that the owner of the lots abutting on the meander had only claimed to the bed of the river, it limited his rights in consequence of the pleadings to that extent, thus preventing the acquisition of the entire section where the section line was beyond the bed of the river.

I now come to the case of *Kean* v. *Roby*, (1896) 145 Indiana, 221, upon the authority of which case the Supreme Court of Indiana affirmed the judgment of the trial court in the case at bar. *Kean* v. *Roby* was an action brought by the owner of lands abutting on Wolf Lake, to quiet her title to land once part of the bed of the lake. The plaintiff claimed title to the border lots as well as to the lake bed land by virtue of the survey made in 1834 and a patent from the United States to the State, made in 1853, under the swamp land act. The defendants claimed title under patents, based upon the Walcott survey of 1875, of lands once part of the bed of the lake. Despite the fact that on the plat of survey the lake was meandered and there were no sectional corners to which the lines could be protracted, the court held that the case was covered by the *Tolleston Club* decision, because it was deemed that the field notes showed that it would be possible to protract the lines so as to make regular and complete sections,

and it was therefore held that the owner of the border lots was entitled to the adjacent land under water as well.

It therefore results that the doctrine embodied in the case of *Kean* v. *Roby*, and the previous cases commencing with *Stoner* v. *Rice*, was the rule applied in the decision of the case now under review, and by which the beds of the lakes were given to the owner of the border lots.

All the cases which have been recapitulated, I submit, divide themselves into two classes, the first, those prior to *Stoner* v. *Rice;* the second, the case of *Stoner* v. *Rice*, and those subsequent to it, including the ruling therein made. Without pausing to ascertain whether the cases in the first class are reconcilable with each other, or those in the second class can be made to harmonize with those in the first, one thing it seems to me is apparent: that is, that all the cases in both the classes, including the decision in the case at bar, indubitably held—

1. That the government of the United States owned the soil under all bodies of non-navigable water lying within the public domain of the United States, and that the title thereto remained in the United States until it had parted with it pursuant to the laws of the United States; and

2. That in determining whether the United States had parted with title to such lands the Indiana court always decided that question, not upon the controlling effect of any supposed rule of state or local law, but by what it deemed to be the proper construction of the laws of the United States governing the survey and disposition of the public domain.

The right of the defendants under patents of the United States, which they specially set up, having been denied, because it was conceived by the court below that no title vested in them under the laws of the United States, it would seem that the question arising for decision is this: Did the court correctly interpret the statutes of the United States?

This is a Federal question. But it is pressed that what title to the beds of the lakes passed to the State from the United States, either under the swamp land act or in virtue of the patents issued to the State, is to be determined, not by the law of the United States, but solely by the state or local law; hence it

is insisted the case must be decided by the law which is rightfully applicable to it and not by the law of the United States, which the Supreme Court of Indiana erroneously deemed was essential to its decision. If I entertained the opinion that the state or local law governed, and in consequence that this case was to be disposed of by considerations inherently local, I would, of course, be obliged to conclude that the controversy must be judged by that law which properly controlled it and not by the law of the United States, which was mistakenly applied by the lower court. In that view my mind would be driven to the conclusion that this case should be dismissed for want of jurisdiction, since here there is no authority to review the action of the state court in a cause inherently depending upon the state or local law. Nor would this result be changed because the defendants asserted rights to the beds of the lakes under patents of the United States issued subsequent to those relied upon by the plaintiff, as its ultimate source of title. This follows, since the claim of the plaintiff was that title had passed to it and out of the United States by the swamp land act or the patents issued prior to those upon which the defendants relied. Now, if the question whether the land claimed by both parties had passed to the plaintiff or its grantors, prior to the issue of the patents to the defendants, is to be determined solely by the state or local law, it would follow that a decision of the state court in favor of the right of the plaintiff involved only a conclusion of state or local law broad enough to sustain the judgment, wholly irrespective of the Federal rights asserted by the defendants, and also entirely without reference to the soundness of the reasoning by which the court had reached its all-sufficient and non-Federal conclusion. Before therefore coming to consider the correctness of the ruling of the state court concerning the United States law which that court deemed to be decisive, it becomes necessary for me to ascertain whether, as asserted, the question as to the extent of the title derived from the United States by the plaintiff or its grantors is to be determined by the state or local law.

The issue which first arises then is, by what law is the quantity of land which passed to the State under the statutes of the

United States and its patents to be determined, by the law of the United States which conferred on the State whatever rights it acquired or solely by the state or local law, which had no agency or influence in passing rights from the United States to the State? In solving this question it is at once conceded that there are two cases—decided by this court on the same day, one resting upon the other, and therefore virtually but one case— announcing the doctrine that where the United States has conveyed land bordering on the meander line of a non-navigable body of water the question of what rights in the land under water passed from the United States to its grantee is to be determined solely by the state or local law.

The cases referred to are *Hardin* v. *Jordan* and *Mitchell* v. *Smale*, reported respectively in 140 U. S. 371 and 406. Both cases were actions of ejectment, and the judgments reviewed were rendered by the Circuit Court of the United States for the Northern District of Illinois. The plaintiff in each case was the owner, by mesne conveyances, under patents of the United States, based upon surveys made in 1834 of fractional lots abutting on the portion of Wolf Lake situated in the State of Illinois, and they claimed as such abutting owners title to land once forming part of the bed of the lake. The defendants asserted title to the lake bed lands upon the survey made in 1874 by the United States, and patents issued to them founded upon such survey. The trial court had held that the title of the owners of the border lots extended only to low water mark and found in favor of the defendants as to the land under water. The ground upon which the decision of the court reversing the trial court in both cases was based is shown in the following excerpts from the opinion in *Hardin* v. *Jordan*, pages 379, 380, 381 and 384:

"The government surveys made in 1834–35 upon which the patent was issued, not only laid down a meander line next to the lake, but also described said lines as running 'along the margin of the lake;' and the plat of the survey, returned to the general and local land offices, and referred to in the patent for identification of the land granted, exhibited the granted tracts as actually bordering upon the lake; and the lake itself on said plat was marked with the words 'Navigable lake,' although the fact

found by the court is that the lake was not and is not a navigable lake, but a non-navigable fresh water lake or pond. The patent itself does not contain all the particulars of the survey, but the grant of the lands is recited to be according to the official plat of the survey of said lands, returned to the General Land Office by the surveyor general, thereby adopting the plat as a part of the instrument.

*    *    *    *    *    *    *    *

"It has never been held that the lands under water, in front of such grants, are reserved to the United States, or that they can be afterwards granted out to other persons, to the injury of the original grantees. The attempt to make such grants is calculated to render titles uncertain, and to derogate from the value of natural boundaries, like streams and bodies of waters.

*    *    *    *    *    *    *    *

"Such being the form of the title granted by the United States to the plaintiff's ancestor, the question is as to the effect of that title in reference to the lake and the bed of the lake in front of the lands actually described in the grant. This question must be decided by some rule of law, and no rule of law can be resorted to for the purpose except the local law of the State of Illinois.

*    *    *    *    *    *    *    *

"It has been the practice of the government from its origin, in disposing of the public lands, to measure the price to be paid for them by the quantity of upland granted, no charge being made for the lands under the bed of the stream, or other body of water. The meander lines run along or near the margin of such waters are run for the purpose of ascertaining the exact quantity of the upland to be charged for, and not for the purpose of limiting the title of the grantee to such meander lines.

*    *    *    *    *    *    *    *

"We do not think it necessary to discuss this point further. In our judgment the grants of the government for lands bounded on streams and other waters, without any reservation or restriction of terms, are to be construed as to their effect according to the law of the State in which the lands lie."

What was the law of Illinois with regard to such grants was

next considered, and it was determined "that the law of Illinois in this regard is the common law, and nothing else," and that the title of the owners of border lots on a non-navigable body of water extended to the middle of the water.

If the doctrine announced in the cases referred to is to be here applied, then, as I have said, there is an end to this case and the writ should be dismissed for want of jurisdiction, since in that view there is no substantial Federal contention in this record, for the reason, as I have previously remarked, that the decision of the state question would be broad enough to sustain the judgment without reference to the Federal rights asserted by the defendants. The doctrine, however, of *Hardin* v. *Jordan*, as it is given me to understand it, is not only unsound in reason but incompatible with many cases decided in this court prior to and since its announcement, and besides is in conflict with the legislation of Congress and the practice of the government from the beginning. Impressed with the correctness of these views, and entertaining the conviction that the enforcement of the doctrine will lead to the gravest consequences in the future, it is proposed to consider its correctness as an original question, before agreeing that its application in the case at bar is proper. If the result of my investigation be the conclusion that the state or local law should not be applied, contrary to the ruling in *Hardin* v. *Jordan*, I shall then proceed to ascertain what are the rights of the parties, when measured by the law of the United States. If that investigation develops that the court below erroneously interpreted the law of the United States, and therefore wrongfully denied the title of the plaintiffs in error, it will be left for me to consider whether it is my duty, under the principle of *stare decisis,* to give my assent to the legal wrong which, under the views stated, was below committed.

It is unnecessary to elaborately demonstrate the elementary proposition that the United States, under the Articles of Confederation, was the owner of the public domain, however acquired, and that, since the adoption of the Constitution, the United States had also possessed, in full proprietorship, the public domain, from whatever source its title has been derived.

The doctrine on the subject was summarized by Chancellor Kent, Com. vol. 1, p. 257, in the following language:

"Upon the doctrine of the court in *Johnson* v. *McIntosh*, (1823) 8 Wheat. 543, and *Fletcher* v. *Peck*, (1810) 6 Cranch, 142, 143, the United States own the soil as well as the jurisdiction of the immense tracts of unpatented lands included within their territories, and of all the productive funds which those lands may hereafter create. The title is in the United States by the treaty of peace with Great Britain, and by subsequent cessions from France and Spain, and by cessions from the individual States."

The matter was aptly epitomized in *Irvine* v. *Marshall*, (1858) 20 How. 558, where it was said (p. 561):

"It cannot be denied, that all the lands in the Territories, not appropriated by competent authority before they were acquired, are in the first instance the exclusive property of the United States, to be disposed of to such persons, at such times, and in such modes, and by such titles, as the government may deem most advantageous to the public fisc, or in other respects most politic."

It is also elementary that land covered by water within the public domain of the United States is as much a part thereof as the dry land. Thus, in *Illinois Central R. R. Co.* v. *City of Chicago*, (1900) 176 U. S. 646, speaking through Mr. Justice Brown, it was said:

"We do not question the general principle that the word 'lands' includes everything which the land carries or which stands upon it, whether it be natural timber, artificial structures or water, and that an ordinary grant of land by metes and bounds carries all pools and ponds, non-navigable rivers and waters of every description by which such lands, or any portion of them, may be submerged, since, as was said by the court in *Regina* v. *Leeds & Liverpool Co.*, 7 Ad. & El. 671, 685: 'Lands are not the less land for being covered with water.'"

But whilst the ownership of the United States, under the Confederation and under the Constitution, both of the dry land and that covered with water in the public domain, cannot be controverted, from the beginning it was conceded that the owner-

ship of the public domain did not carry with it navigable waters or the land constituting the beds thereof, as such waters were considered within the class of public waters to be forever devoted to the public use. This was recognized by a provision of the ordinance of 1787 for the government of the Northwest Territory, as follows:

"The navigable waters leading into the Mississippi and Saint Lawrence, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of the said Territory as to the citizens of the United States, and those of any other States that may be admitted into the Confederacy, without any tax, impost, or duty therefor."

And, early in the history of Congress, prior to the adoption in 1805 of a general system for the survey of the whole public domain of the United States, the same principle was expressed in the act of May 18, 1796, 1 Stat. 464, the ninth section of which act was as follows:

"SEC. 9. *And be it further enacted*, That all navigable rivers, within the territory to be disposed of by virtue of this act, shall be deemed to be, and remain public highways. And that in all cases, where the opposite banks of any stream, not navigable, shall belong to different persons, the stream and the bed thereof shall become common to both."

And because navigable waters were thus from the beginning recognized as public highways and have ever since been then treated as sacredly devoted to the public use, they were always in principle excluded from the sales of the public domain. But the contrary rule has from the beginning prevailed as respected non-navigable waters, which have always been surveyed and sold and paid for. I shall take occasion hereafter in reviewing the legislation of Congress to demonstrate this fact, and therefore to point out that the statement to the contrary in the passage from the opinion in *Hardin* v. *Jordan*, which I have already quoted, must have been the result of confounding the general practice not to sell public waters with the universal practice to survey and sell non-navigable or private waters. No better illustration of the truth of this statement is required than is shown by this case, where the United States sold and

surveyed the beds of the non-navigable waters to the defendants below long after the grant of the border lots; and the same condition of things is evidenced by other of the Indiana cases which have been reviewed, and it is to be observed that in two of the cases the grant or direction to sell the land covered by non-navigable waters was made by special acts of Congress long after the border lots had been disposed of.

Doubtless as the result of the provisions treating navigable waters as public highways and from a consideration of the nature and extent of the powers vested by the Constitution in the Federal government and those reserved to the States, and by a consideration of the doctrine of public and private waters known to the common law, it was early decided and has been repeatedly reiterated that the navigable waters and the land under them belonged to the States—as well the new as the old —in virtue of their sovereignty, to be held in trust for their people subject to the power of Congress to regulate commerce. And in harmony with the principle just stated, it has been decided that such navigable waters and the land under them in the public domain of the United States within the Territories, while subject to be disposed of by Congress, under the trust for public use, were yet held by the United States to be transmitted to the new States to be formed, and which should, when endowed with statehood, possess them with the same rights and powers as the original States. A list of the cases in which this doctrine is stated is appended in the margin.[1]

---

[1] *Martin v. Waddell,* (1842) 16 Pet. 367, 410 ; *Pollard v. Hagan,* (1845) 3 How. 212 ; *Goodtitle v. Kibbe,* (1850) 9 How. 471 ; *Doe v. Beebe,* (1851) 13 How. 25 ; *United States v. Pacheco,* (1864) 2 Wall. 587 ; *Mumford v. Wardwell,* (1867) 6 Wall. 423 ; *Smith v. Maryland,* (1855) 18 How. 71, 74 ; *Weber v. Harbor Commissioners,* (1873) 18 Wall. 57 ; *Barney v. Keokuk,* (1876) 94 U. S. 324 ; *McCready v. Virginia,* (1877) 94 U. S. 391 ; *St. Louis v. Myers,* (1885) 113 U. S. 566 ; *Manchester v. Massachusetts,* (1891) 139 U. S. 240; *Packer v. Bird,* (1891) 137 U. S. 661 ; *St. Louis v. Rutz,* (1891) 138 U. S. 226; *San Francisco v. Le Roy,* (1891) 138 U. S. 656, 671; *Knight v. Land Association,* (1891) 142 U. S. 161, 183 ; *Kaukauna Water Power Co. v. Green Bay & M. Canal Co.,* (1891) 142 U. S. 255 ; *Illinois Central R. R. Co. v. Illinois,* (1892) 146 U. S. 387 ; *Shively v. Bowlby,* (1894) 152 U. S. 1 ; *Grand*

The doctrine of the cases was clearly stated in the opinion delivered by Mr. Justice Field, speaking for the court, in *Illinois Central R. R. Co.* v. *Illinois,* 146 U. S. 387, 435, where it was said :

" It is the settled law of this country that the ownership of. and dominion and sovereignty over lands covered by tide waters, within the limits of the several States, belong to the respective States within which they are found, with the consequent right to use or dispose of any portion thereof, when that can be done without substantial impairment of the interest of the public in the waters, and subject always to the paramount right of Congress to control their navigation so far as may be necessary for the regulation of commerce with foreign nations and among the States. This doctrine has been often announced by this court, and is not questioned by counsel of any of the parties. *Pollard's Lessee* v. *Hagan,* 3 How. 212 ; *Weber* v. *Harbor Commissioners,* 18 Wall. 57.

" The same doctrine is in this country held to be applicable to lands covered by fresh water in the Great Lakes over which is conducted an extended commerce with different States and foreign nations. These lakes possess all the general characteristics of open seas, except in the freshness of their waters, and in the absence of the ebb and flow of the tide. In other respects they are inland seas, and there is no reason or principle for the assertion of dominion and sovereignty over and ownership by the State of lands covered by tide waters that is not equally applicable to its ownership of and dominion and sovereignty over lands covered by the fresh waters of these lakes."

And as a necessary consequence of the ownership by the States, in trust, of the navigable waters and the land under them within their territorial jurisdiction, it came to be decided that rights in and incident to such navigable waters or the land under them were to be determined solely with reference to the law of the State in which such navigable waters were situated. *Barney* v. *Keokuk,* (1876) 94 U. S. 324; *St. Louis* v. *Myers,*

*Rapids & I. R. R. Co.* v. *Butler,* (1897) 159 U. S. 87 ; *St. Anthony Falls Water Power Co.* v. *St. Paul Water Comrs.,* (1897) 168 U. S. 349, and *Mobile Transportation Co.* v. *Mobile,* (1903) 187 U. S. 479.

(1885) 113 U. S. 566; *Packer* v. *Bird,* (1891) 137 U.. S. 661, 690; *St. Louis* v. *Rutz,* (1891) 138 U. S. 226, 242; *Shively.* v. *Bowlby,* (1894) 152 U. S. 1, 40; *Grand Rapids & I. R. Co.* v. *Butler,* (1897) 159 U. S. 87; *St. Anthony Falls Water Power Co.* v. *St. Paul Water Comrs.,* (1897) 168 U. S. 349. But, resting as this last rule necessarily does upon the ownership of such waters by the States, it can have no application to the proposition that rights in and to the land beneath the non-navigable waters of the public domain which belong to the United States; are to be determined solely by the law of the States. On the contrary, the decision that the right to the property belonging to the States is to be determined by the state law, because of the state ownership, involves the converse proposition that the effect of a grant of land and waters in the public domain of the United States, which are not navigable, and, therefore, belong to the United States, is to be determined by the law of the United States.

The ownership by the United States of the public domain being thus unquestionable, there can be no room for the contention that the quantity and character of property in the public domain which passes by grant from the United States is not to be exclusively measured by the law of the United States, because of want of power in the United States over the subject matter of sale of the public domain. Such a contention would be obviously without merit, in view of the express delegation of authority concerning the property of the United States, contained in the third section of the fourth article of the Constitution, whereby Congress was vested with power " to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States."

The comprehensive system of legislation, beginning with the very birth of the government, providing for the survey and sale of the public domain, the administrative machinery devised for executing these laws and the multitude of decisions of this court concerning questions which have arisen thereunder, which have ever been deemed proper to be determined solely from a consideration of the laws of the United States, to my mind serve to demonstrate the unsoundness of the proposition that

any other law than that of the United States measures the nature and extent of title to the public domain conveyed by authority of the laws of the United States.

Besides the implication resulting from the general legislation of Congress concerning the sale and disposition of the public domain, the special statutes granting rights in and regulating the use of the non-navigable waters upon the public lands are very conclusive. Act of July 26, 1866, 14 Stat. 253; Act of March 3, 1877, 19 Stat. 377; Act of March 3, 1891, 26 Stat. 1095; Act of June 17, 1902, 32 Stat. 388. See, in this connection, *Gutierres* v. *Albuquerque Land & Irrigation Co.*, 188 U. S. 545, and *United States* v. *Rio Grande Dam and Irrigation Co.*, 174 U. S. 690, 704, *et seq*.

I refer to a few cases in which the complete and efficient power of the United States and the controlling effect of its laws have been considered and lucidly stated.

In *Bagnell* v. *Broderick*, (1839) 13 Pet. 436, it was held that a state legislature was not competent to declare a certificate of purchase of equal dignity with a patent; and it was observed (p. 450):

"Congress has the sole power to declare the dignity and effect of titles emanating from the United States."

*Wilcox* v. *Jackson*, (1839) 13 Pet. 498, was an action in ejectment, brought in a state court of Illinois, to recover property which had at one time been part of a military post. The plaintiff based his claim upon a register's certificate, which the laws of Illinois declared to be evidence of title sufficient to support an action in ejectment. In reversing the judgment for the plaintiff, the court, in the course of the opinion, speaking through Mr. Justice Barbour, said (p. 516):

"It has been said, that the State of Illinois has a right to declare by law, that a title derived from the United states, which, by their laws, is only inchoate and imperfect, shall be deemed as perfect a title as if a patent had issued from the United States; and the construction of her own courts seems to give effect to her statute. . . . We hold the true principle to be this, that whenever the question in any court, state or Federal, is, whether a title to land which had once been the

property of the United States has passed, that question must be resolved by the laws of the United States; but that whenever, according to those laws, the title shall have passed, then that property, like all other property in the State, is subject to the state legislation, so far as that legislation is consistent with the admission that the title passed and vested according to the laws of the United States."

*Irvine* v. *Marshall*, (1858) 20 How. 558, was an action originally brought in a court of the Territory of Minnesota. It was alleged that the defendant Marshall, as the agent of the plaintiff, had purchased certain public lands with funds belonging to plaintiff and a co-defendant; that Marshall thereafter took a patent certificate in his own name and refused to convey an undivided half of the land to the plaintiff. The bill of complaint was demurred to upon the ground that the action could not be maintained because of certain provisions of the territorial statute relating to resulting trusts. Applying its previous ruling in *Wilcox* v. *Jackson*, the court, in the course of the opinion, speaking through Mr. Justice Daniel, said (p. 563) :

"Within the provisions prescribed by the Constitution, and by the laws enacted in accordance with the Constitution, the acts and powers of the government are to be interpreted and applied so as to create and maintain a *system*, general, equal, and beneficial as a whole. By this rule, the acts and the contracts of the government must be understood as referring to and sustaining the rights and interests of all the members of this Confederacy, and as neither emanating from, nor intended for the promotion of, any policy peculiarly local, nor in any respect dependent upon such policy. The system adopted for the disposition of the public lands embraces the interests of all the States, and proposes the equal participation therein of all the people of all the States. This system is therefore peculiarly and exclusively the exercise of a Federal power. The theater of its accomplishment is the seat of the Federal government. The mode of that accomplishment, the evidences or muniments of right it bestows, are all the work of Federal functionaries alone."

In *United States* v. *Gratiot*, (1840) 14 Pet. 526, 537, consid-
ering an objection that Congress was without power to lease
the public lands, it was said (p. 537) :

"Congress has the same power over the public lands as over
any other property belonging to the United States ; and this
power is vested in Congress without limitation."

In *Gibson* v. *Chouteau*, (1872) 13 Wall. 92, a state statute of
limitations was held ineffective as against a patent from the
United States. The court, speaking through Mr. Justice Field,
said (p. 100) :

"The same principle which forbids any state legislation inter-
fering with the power of Congress to dispose of the public
property of the United States, also forbids any legislation de-
priving the grantees of the United States of the possession and
enjoyment of the property granted by reason of any delay in
the transfer of the title after the initiation of proceedings for its
acquisition. The consummation of the title is not a matter
which the grantees can control, but one which rests entirely
with the government. With the legal title, when transferred, goes the right to possess and enjoy the land, and it
would amount to a denial of the power of disposal in Congress
if these benefits, which should follow upon the acquisition of
that title, could be forfeited because they were not asserted
before that title was issued."

In *Fink* v. *O'Neil*, (1882) 106 U. S. 272, 283, Mr. Justice
Matthews delivering the opinion of the court, considering the
fourth section of the homestead act of May 20, 1862, which
provided that no lands acquired thereunder should, in any event
become liable to any debt contracted prior to the issuing of the
patent therefor, it was declared that Congress by such provision
had made the exemption of such lands from sale on execution
a *permanent* part of the national policy.

In *Packer* v. *Bird*, (1891) 137 U. S. 661, the court passed on
the extent of the grant contained in a patent of the United
States, to land in California, one portion whereof abutted on
the Sacramento River. The patent was issued upon a decree
of confirmation on a previously existing right or equity of the
patentee to the lands, and the survey made pursuant to the

decree was incorporated in the patent. In the course of the opinion, speaking through Mr. Justice Field, the court said (p. 669):

" The courts of the United States will construe the grants of the general government without reference to the rules of construction adopted by the States for their grants; but whatever incidents or rights attach to the ownership of property conveyed by the government will be determined by the States, subject to the condition that their rules do not impair the efficacy of the grants or the use and enjoyment of the property by the grantee."

In *Shively* v. *Bowlby*, (1894) 152 U. S. 1, 44, Mr. Justice Gray delivering the opinion, the language just quoted was approvingly referred to; and Mr. Justice Peckham, speaking for the court, in *St. Anthony Falls Water Power Co.* v. *Water Commissioners*, (1897) 168 U. S. 349, 362, again approvingly referred to the statement.

How completely these authorities apply to this case becomes, I think, manifest when it is borne in mind that the question is whether the United States by the conveyance which it made of the land abutting on the water parted with the title which it confessedly owned prior to the conveyance, to the beds of the lakes themselves. The reservation as to rights and incidents referred to in the excerpt made above from the opinion in *Packer* v. *Bird*, is but a reiteration of the doctrine enunciated by the court in the concluding sentences of the opinion in *Irvine* v. *Marshall, supra,* and its import is further shown by the opinion in *Barney* v. *Keokuk,* 94 U. S. 324. In the latter case, the question presented was what rights in the beds of navigable streams attached to abutting lands conveyed by grants of the United States, and the court said that as the beds of navigable waters within a State were the property of the State, by virtue of its sovereignty, no rights in the bed of such a stream could be conferred by a conveyance from the United States, unless the state law vested such rights in the owners of the upland without reference to the source from which the title to the upland had been derived. If such be the power of the States as to navigable waters which they hold in trust, it necessarily follows

that what rights pass by a conveyance from the United States to land under non-navigable waters must be determined by the laws of the United States, to whom such land and water when situated in the public domain belong in absolute ownership.

The ownership in the United States and its exclusive power under the Constitution to administer and control its property being thus demonstrated, it follows that the state law is not the proper criterion by which to ascertain what the United States conveyed, and, therefore, there is a Federal question to be examined.

The court below held although the United States survey had not, in fact, been extended beyond the meander line and the lots conveyed by the United States were described as fractional on the plat and in the patents, that the patentees yet took full subdivisions. The principle applied was this: Where marsh land or non-navigable waters were within a meander line upon which fractional lots abutted, the conveyance of such lots by the United States carries also the marsh land or non-navigable water beyond the meander to the extent of a full subdivision. And in order to accomplish this result the marsh land and water inside of the meander will be considered to have been surveyed, and the lines of the survey be hence protracted across the meander so as to embrace a full subdivision. Whilst this theory was plainly irreconcilable with the construction given to the United States law by the Supreme Court of Indiana in cases decided by it prior to *Stoner* v. *Rice, ub. sup.,* that case announced the rule, and the subsequent cases in Indiana have sanctioned it down to and including *Kean* v. *Roby,* upon which the decision in this case was rested. In *Hardin* v. *Jordan* the doctrine of *Stoner* v. *Rice* was criticised as an unwarranted departure from the common law, and it was observed—as was undoubtedly the case—that the Indiana court in *Stoner* v. *Rice* but adopted the rule announced by the Supreme Court of Michigan in *Clute* v. *Fisher,* 65 Michigan, 48, decided in 1887, shortly before the decision in *Stoner* v. *Rice.* Now, the opinion in *Clute* v. *Fisher* shows that the Michigan court in that case but followed a prior ruling made by it at the same term, in *Palmer* v. *Dodd,* 64 Michigan, 474. The latter case involved title to land within a

section made fractional by a meandered lake or marsh, and the controversy turned upon whether under the law of the United States the rights of the owner of the fractional section extended beyond the meander line. The Supreme Court of Michigan, in deciding the question, said :

"When the United States grants by patent land described by a legal subdivision, the grantee is entitled to all the land embraced within the legal subdivision contained in his grant, and is not limited by the number of acres specified in the patent or upon the government plat. The meanders have no significance as boundaries, and are not intended as such. They are run simply to afford a means of computing the area contained in the fraction which the United States requires payment for on sale of the public domain. But no grantee by such patent, granting a legal subdivision of land, can derive title to land upon another legal subdivision. This we have decided in the cases of *Wilson* v. *Hoffman*, 54 Michigan, 246; *Keyser* v. *Sutherland*, 59 Michigan, 455, which were based upon the decision of the Supreme Court of the United States in *Brown's Lessees* v. *Clements*, 3 How. 650."

It is hence apparent that the rule in *Clute* v. *Fisher* was based upon the construction of the law of the United States expounded by this court in *Brown* v. *Clements*, 3 How. 650. But long prior to the decision in *Clute* v. *Fisher* this court, in *Gazzam* v. *Phillips*, (1857) 20 How. 372, had reviewed the case of *Brown* v. *Clements*, and decided that the sale of a fractional lot did not convey a full subdivision ; and in consequence of this view the case of *Brown* v. *Clements* was expressly overruled. In subsequent cases in Michigan the fact that that court had mistakenly predicated its conclusion in *Clute* v. *Fisher* on a case which this court had overruled, has been conceded. *Grand Rapids Ice & Coal Co.* v. *South Grand Rapids Ice & Coal Co.*, 102 Michigan, 227. But whilst the Michigan court has thus recognized the error into which it inadvertently fell in *Clute* v. *Fisher*, the Indiana court has continued to apply that rule, although the sole authority upon which it rests has been repudiated.

Besides the error in the ruling below which is thus shown to

exist, the principle applied is moreover in conflict with decisions of this court since the ruling in *Gazzam* v. *Phillips*.

In *Horne* v. *Smith*, 159 U. S. 40, certain fractional lots appeared by the plat of survey to be bounded on the west by the meander line of the Indian River. It was, however, found as a fact that the water line which was surveyed and made the boundary of the lots was the line of a bayou or savannah, and that there had been an omission to make a survey of the land west of the bayou and between it and the main bed of the Indian River. The court, speaking through Mr. Justice Brewer, said (p. 45):

" Although it was unsurveyed it does not follow that a patent for the surveyed tract adjoining carries with it the land which, perhaps, ought to have been, but which was not in fact, surveyed. The patent conveys only the land which is surveyed, and when it is clear from the plat and the surveys that the tract surveyed terminated at a particular body of water, the patent carries no land beyond it."

In *Niles* v. *Cedar Point Club*, 175 U. S. 300, it appeared that a survey was made in 1834–1835 of fractional townships in the northern part of Ohio, adjacent to Lake Erie. By the field notes and plat certain sections were shown as fractional, because a tortuous meander line was shown upon the plat of survey upon which the fractional lots abutted. Across this meander line there was a region of country described as a marsh, and agreed in the statement of facts to be a body of low, swamp land, partly boggy and partly dry, stretching beyond to the shores of Lake Erie. The claim of the owner of the abutting lands was that his boundary was not the meander at the edge of the marsh, but Lake Erie. By referring to the plat previously excerpted in reviewing one of the *Tolleston Club* cases, showing the situation of the land which was in controversy in those cases, it will be seen that the precise condition passed upon in those cases was involved in *Niles* v. *Cedar Point Club*, *supra*. With the exact situation confronting it, instead of applying the erroneous rule announced in Indiana, this court held that the purchaser of the fractional lots abutting on the meander did not take a complete subdivision, but was

confined by the meander line and got only the land which he bought and paid for. The court, speaking through Mr. Justice Brewer, said (p. 306):

" It appears distinctly from the field notes and the plat that the surveyor, Rice, stopped his surveys at this ' marsh' as he called it. These surveys were approved and a plat prepared, which was based upon the surveys and field notes, and showed the limits of the tracts which were for sale. The patents, referring in terms to the survey and plat, clearly disclose that the government was not intending to and did not convey any land which was a part of the marsh.

\*    \*    \*    \*    \*    \*    \*    \*

" It may be that surveyor Rice erred in not extending his surveys into this marsh, but his error does not enlarge the title conveyed by the patents to the surveyed fractional sections. The United States sold only the fractional sections, received only pay therefor, an amount fixed by the number of acres conveyed, and one receiving a patent will not ordinarily be heard to insist that by reason of an error on the part of the surveyor more land was bought than was paid for, or than the government was offering for sale."

And the same meaning was attributed to a meander line in *French-Glenn Live Stock Co.* v. *Springer*, 185 U. S. 47, 54.

But it is said the State of Indiana was entitled to the land under the beds of the lakes in and by virtue of the act of Congress of September 28, 1850, known as the swamp land act, and, therefore, the error committed below, as to the meaning of the survey and patents, is without importance. But the State could not acquire a legal title to land under the swamp land act except by patent, *Niles* v. *Cedar Point Club*, 175 U. S. 309 ; *Brown* v. *Hitchcock*, 173 U. S. 473 ; *Rogers' Locomotive Machine Works* v. *American Emigrant Company*, 164 U. S. 559, 574 ; *Michigan Land and Lumber Co.* v. *Rust*, 168 U. S. 589, 592, and such patent must have been based upon a survey, as the statute clearly contemplated the selection and patenting only of " legal subdivisions." Act September 28, 1850, 9 Stat. 519. The survey having stopped at the bank, and the bed of the lake not having been surveyed, platted or subdivided, or the area thereof ascertained,

no right of the State had attached to the lake bed land under the swamp land act. Indeed, whilst some of the earlier cases in Indiana construed the swamp land act in direct conflict with the meaning of that act as interpreted by this court in the cases above cited, in a later case, *Tolleston Club* v. *State*, the Indiana court, on the rehearing, pointed out that under a correct construction of the swamp land act a survey and a patent were essential prerequisites to the passing of rights to the State under the swamp land act. And the confirmatory act of March 3, 1857, 11 Stat. 251, clearly has no application, as patents had issued in 1853 upon all the selections made for the State.

The mind cannot fail at once to perceive the serious disturbance to vested rights which must follow from the suggestion that title passed to the State of Indiana, under the swamp land act, to land belonging to the United States, which at the time of the issue of the patents to the State had not been surveyed or selected by the Secretary of the Interior for account of the State, and which was not parcelled into legal subdivisions until 1875, when the lake bed land in question was surveyed as the property of the United States.

I am brought, then, to these questions: Did the United States, by running meander lines, lose her title to the lands within such lines? and did she, by issuing patents for the fractional lots abutting on lakes which were thus meandered, convey to her grantees title to the center of the lakes?

It cannot be successfully controverted that from the beginning, both under the Confederation and since the adoption of the Constitution, the laws for the survey and sale of the public domain have contemplated as well the survey and sale of both dry land and land covered by water, except that under navigable waters. This so clearly results from the text of the statutes that I content myself with making reference to the sections of the Revised Statutes relating to the subject and to a citation in the margin of some of the earlier statutes.[1]

---

[1] Ordinances of Confederation : May 20, 1785, 1 Birchard's Land Laws, p. 11 ; July 13, 1787, art. 4, 1 Birchard, p. 18 ; July 23, 1787, 1 Birchard, p. 24 ; June 20, 1788, 1 Birchard, p. 29 ; and July 9, 1788, 1 Birchard, p. 33. Acts of Congress : April 21, 1792, 1 Stat. 257 ; May 5, 1792, 1 Stat. 266 ;

The fact that land under non-navigable waters was subject to survey and sale, and the settled practice of meandering navigable streams and making fractional abutting lots, is aptly illustrated by the case of *Surgett* v. *Lapice,* (1850) 8 How. 48. The question presented in that case arose under the act of March 3, 1811, 2 Stat. 662, relating to the mode of surveying public lands in the Territory of Orleans. By the second section of that act power was conferred to depart from the rectangular mode of survey as respected lands abutting on certain waters in the Territory. Such lands were to be laid out into tracts as near as practicable of a specified frontage and depth on a river or bayou, and to be bounded by such lines as the nature of the country would render practicable and most convenient. By the fifth section of the act certain rights of preëmption or double concessions in the lands back of tracts fronting on such waters were created under described conditions in favor of the front proprietors, it being provided in the act that double concessions should in no event extend so far in depth as to include lands fit for cultivation " bordering on another river, creek, bayou or water course." Within the area of a double concession involved in the controversy in the case named there was a bayou, and the claim on one side was that the double concession should extend back and embrace the lands on the bayou on the theory that it was nonnavigable, while, on the other hand, it was contended that the bayou should be treated as navigable, and that the double concession could not be extended back to embrace the lands bordering on the bayou. Considering the contention that the waters of the bayou in question, though non-navigable, came within the description of water courses recited in the act, the court said (p. 69) :

" To what description of water course did the legislature re-

---

May 18, 1796, 1 Stat. 464; May 10, 1800, 2 Stat. 73 ; March 3, 1803, 2 Stat. 233 ; March 26, 1804, 2 Stat. 277 ; February 11, 1805, 2 Stat. 313 ; March 2, 1805, 2 Stat. 324; March 3, 1811, 2 Stat. 662 ; April 24, 1820, 3 Stat. 566; April 5, 1832, 4 Stat. 503. Revised Statutes : Title XXXII, The Public Lands, particularly chapter four (Preëmptions), chapter five (Homesteads), chapter seven (Sale and Disposal of the Public Lands), and chapter nine (Survey of the Public Lands).

fer ? The enacting clause provides that every person who owns a tract of land ' bordering' on any river, creek, bayou, or water course, shall have the right of preëmption to the back land. The act of 1811 has been construed, in the Department of Public Lands, for nearly forty years, to mean that those owners whose lands fronted on a navigable stream were only provided for; and that the word ' border,' both in the enacting clause and in the exception, meant to front on a navigable water course; that is to say, such waters as are described in the third section of the act of February 20, 1811, by which Louisiana was authorized to form a state constitution and government, by which act the river Mississippi, and the navigable rivers and waters leading into the same, or into the Gulf of Mexico, were declared to be common highways, and forever free, as well to the inhabitants of the said State, as to other citizens of the United States.

"Similar provisions as respects navigable waters are common to other States where there are public lands, and the practice has been uniform to survey and sell the lands ' bordering' on navigable streams as fractional sections; nor is the channel ever sold to a private owner. Of necessity, it had to be left almost exclusively to the Department of Lands executing the public surveys to ascertain what stream was navigable, and should be bordered by fractions and reserved from sale; and, on the other hand, what waters were not navigable, and should be included in square sections, and the channel sold."

Whilst, of course, the case arose under the act of 1811, the opinion points to the general rule obtaining for years in the Land Department on the subject of the sale of land under nonnavigable waters and the exclusion of land forming the beds of navigable or public waters from survey and sale.

Without presently developing this subject further, I append in the margin [1] a reference to acts of Congress, rules of the

[1] Act of July 1, 1870, 16 Stat. 187 ; Act of January 11, 1873, 17 Stat. 409 ; Act of February 19, 1874, 18 Stat. 16 ; Act of December 21, 1874, 18 Stat. 293; Manual of Surveying Instructions, February 22, 1855, approved by Congress, May 30, 1862, 12 Stat. 409 ; Instructions of Commissioner of General Land Office of July 13, 1874, Copp's Public Land Laws, p. 765 ; Report of Commissioner of General Land Office, 1868, p. 131 ; Manual of

Land Department governing surveys and reports of the executive officers charged with the survey and disposition of the public domain, which beyond peradventure show that from the very beginning of the government up to the decision in *Hardin* v. *Jordan*, the general practice was to treat the land under non-navigable waters as the property of the United States, and to survey and sell the same as part of the public domain. Indeed, the proposition just stated is established by the facts disclosed in the various cases decided by the Supreme Court in Indiana which I have at the outset reviewed.

Whilst, as pointed out in *Surgett* v. *Lapice*, the existence of a navigable stream was the reason which usually occasioned a meander line, and hence fractional subdivisions, the provisions of the surveying laws, both under the Confederation and since, contemplated such a meander line also wherever there existed an Indian reservation or private land claim which at the time of the survey was made prevented the extension of the public surveys. But it is apparent that from an early day meander lines and resulting fractional sections came to be established not only when occasioned by navigable rivers, Indian reservations or private land claims, but from other causes. Thus where the deputy surveyor encountered a morass or swamp which he deemed impassable or such a body of non-navigable water as in his judgment it would not be profitable then to survey, a meander line would be run and fractional sections created. When this practice first originated, and whether the surveyor general of the respective surveying districts applied uniform rules concerning it, the official documents of which I can take judicial notice do not enable me to determine. But certain it is that the practice prevailed prior to 1827. This is evidenced

---

Surveying Instructions, May 3, 1881, p. 34, January 1, 1890, p. 33, and June 30, 1894, p. 57, which last was approved by act of August 15, 1894, 28 Stat. 285 ; Report of the Commissioner of the General Land Office, 1877, p. 11.; Letter of Secretary of Interior in response to a resolution of the House of Representatives respecting the survey of Lakes Wolf and George in Indiana and Illinois, H. R. Ex. Doc. No. 83, 45th Congress, 2d session; Report of the Commissioner of the General Land Office, in response to Senate resolution of January 14, 1896, giving information relative to certain lakes in Louisiana, Sen. Doc. No. 101, 54th Congress, 1st session.

by a communication from the Land Department to the surveyor general at Washington, Mississippi, dated January 30, 1827, 2 Birchard's Comp. p. 862, and also by a letter from the Commissioner to the surveyor general at Cincinnati, Ohio, dated March 11, 1836, 2 Birchard's Comp. p. 962. That complaint was sometimes made that deputy surveyors had mistakenly meandered marsh land, which it was asserted should have been surveyed, subdivided and platted, is also indicated by the official communication last referred to. The practice as to non-navigable lakes above alluded to is moreover shown by the meandering of the very lakes here in controversy (Wolf and George) as early as 1835, of Beaver Lake and the lands adjacent to the Calumet River about the same time, as shown by the Indiana decision in the *Portsmouth Bank* and *Tolleston Club* cases, and of Cross, Soda, Clear and Fairy Lakes in Louisiana in 1839. Sen. Doc. 101, 54 Cong. 1st session.

The general practice as to meandering lakes and ponds prevailing in the surveying districts created prior to 1850 is, however, conclusively shown by the "Manual of Instructions" dated February 22, 1855, issued by the Land Department for the guidance of the surveyors and deputy surveyors. In a letter transmitting this manual, the Commissioner of the General Land Office directed attention to the fact that it was a revised edition of the previous instructions on the subject. Among the instructions contained in this manual was the following, 1 Lester Land Laws, p. 714:

"3. You are also to meander, in manner aforesaid, all *lakes* and deep ponds of the area of twenty-five acres and upwards; also navigable bayous; *shallow* ponds, readily to be drained, or likely to dry up, are not to be meandered."

This manual was approved by Congress on May 30, 1862, 12 Stat. 409. Like manuals, reiterating the instructions above referred to, were issued on May 3, 1881, January 1, 1890, and June 30, 1894 (p. 57); and the manual of 1894 was approved by Congress on August 15, 1894, 28 Stat. 285.

Whilst the statements already made are sufficient to demonstrate that the rule contained in the manuals but substantially expressed the practice prevailing from the beginning, such

fact is additionally demonstrated by the report of the Commissioner of the General Office for 1868, (p. 131,) wherein, referring to the rule, he said that in substance it but reiterated the practice always followed in the Land Department.

There is in reason then no support for the proposition announced in some cases decided by state courts—presumably on the authority of the rule in *Hardin* v. *Jordan*—that the stopping of a survey at the margin of a non-navigable body of water and the meandering of the same operate to deprive the United States of the title to land within the meanders, which the United States had owned before the meander lines were run. To say this would be only to declare that power existed in the executive officers of the government to strip the United States of its property by a mere method of survey, when from the beginning no authority to that effect had been conferred, and no such purpose was contemplated. The practice of the government and the decisions of this court, it seems to me, leave no room for controversy on this subject. Thus, where a navigable stream was meandered, and within the meander lines were unsurveyed islands forming part of the public domain of the United States, and a request was subsequently made under the provisions of the statutes of the United States for their survey, 12 Stat. 410, the practice of the department was to comply with the request and survey and dispose of the islands as parts of the public domain. Report Land Office, 1868, p. 121. And, as said in the same report, in referring to the rule prevailing from the beginning concerning the meandering of lakes and ponds, where, subsequently to such meandering, lake beds were reported as dry, they "were surveyed and brought into the market. In all these instances the United States has but exercised the ordinary right of proprietorship."

The decisions of this court already referred to conclusively establish at the same time that the mere running of a meander line did not affect the title of the United States to the land within such meanders. Without going over all the cases, it suffices to call attention on this point to *Gazzam* v. *Phillips*, 20 How. 372, and *Niles* v. *Cedar Point Club*, 175 U. S. 300.

Quite recently the subject was again passed upon in *United States* v. *Mission Rock Company*, 189 U. S. 391.    In that case there existed in navigable waters a small island, and whilst the title of the State to the land under the navigable waters was sustained, the title of the United States to the island was upheld.

The prior title of the United States being unaffected by the meander, did the conveyance by the United States of a specified quantity of land contained in described fractional lots abutting on a meander, the land under water within the meanders being unsurveyed and unplatted, convey by legal intendment more than the grant purported to embrace?

It cannot be controverted that at common law, as elaborately pointed out in *Hardin* v. *Jordan*, the owner of land abutting on an unnavigable body of water, by conveying the upland as bounding on the water, without restriction or reservation in the deed, in legal effect caused the center of the stream to be the boundary of the land conveyed.    But, it seems to me, it cannot be questioned that the statutes of the United States relating to the disposal of the public domain confer no power whatever to sell unsurveyed public land nor do such statutes invest courts with the authority to enlarge the grants actually specified in the patents of the United States.    A grant by the United States is to be interpreted by the statutes of the United States, and therefore is not subject to be enlarged by any principle of conveyance beyond the express intendment of the statute under the authority of which the grant is made.    The difference between the rules of construction applicable to grants made by a government and the grant made by an individual is that grants of the government are to be strictly construed in its favor and against the grantee; in other words, that nothing passes by the grant but that which is necessarily and expressly embraced in its terms.

The doctrine on this subject was aptly stated by the court in *Shively* v. *Bowlby*, speaking through Mr. Justice Gray, where it was said (152 U. S. 10):

"It was argued for the defendants in error that the question presented was a mere question of construction of a grant bounded

by tide water, and would have been the same as it is if the grantor had been a private person. But this is not so. The rule of construction in the case of such a grant from the sovereign is quite different from that which governs private grants. The familiar rule and its chief foundation were felicitously expressed by Sir William Scott: 'All grants of the Crown are to be strictly construed against the grantee, contrary to the usual policy of the law in the consideration of grants; and upon this just ground, that the prerogatives and rights and emoluments of the Crown being conferred upon it for great purposes, and for the public use, it shall not be intended that such prerogatives, rights and emoluments are diminished by any grant, beyond what such grant by necessary and unavoidable construction shall take away.' *The Rebeckah*, 1 C. Rob. 227, 230. Many judgments of this court are to the same effect. *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420, 544–548; *Martin* v. *Waddell*, 16 Pet. 367, 411; *Central Transportation Co.* v. *Pullman's Car Co.*, 139 U. S. 24, 49."

Applying this doctrine to the lands in question, as the law of the United States conferred no authority to transfer unsurveyed land and confined the patentee to the land actually described in the patent as strictly construed, it follows that by the issue of its patents for fractional lots abutting on the water the United States did not transfer the title to the beds of the lakes in question within the meander lines.

And the Land Department in executing the acts of Congress and Congress itself in dealing with the subject have so uniformly manifested the purpose that the grants of the United States to land bordering on a non-navigable body of water should not convey the land under the water belonging to the United States beyond the limits of the land actually expressed in the patent as conveyed, that it seems to me the statutes for the disposition of the public domain should be read as if they contained an express provision to that effect.

I have already shown the rule prevailing from the earliest day for the meandering of non-navigable lakes and ponds, and in doing so called attention to the report of the Commissioner of the General Land Office made in 1868, in which he stated

that it had been the constant practice from the beginning, after lakes had been meandered and on the lakes becoming dry, to survey and dispose of the beds thereof. As evidencing this practice, I call attention to the following :

The Land Department, on July 13, 1874, Copp's Public Land Laws, 1875, p. 765, issued directions which were to govern the survey of the beds of non-navigable lakes and other like bodies of water which had been meandered at the time of the original survey and which had become suitable for survey and sale. As the circular of instructions related only to districts where the office of surveyor general had been abolished and could not have been intended to create a rule in such districts different from that obtaining in other districts, the legitimate inference from the instructions is that it was intended to put in effect in such districts the practice usual in other districts where the office of surveyor general had not been done away with. This view finds support in the prelude to the letter forwarding the circular of instructions, which says : "As inquiries arise in regard to the survey of the beds of meandered lakes or other similar bodies of water in districts where the office of surveyor general has been discontinued, the following is communicated," etc. The instructions which followed authorized the survey of the beds of such lakes as the property of the United States, when the waters had "so permanently receded or dried up as to leave within the unsurveyed area dry land fit, in ordinary seasons, for agricultural purposes." The remainder of the instructions dealt with the mode of proceeding to have a survey made and title obtained by individuals.

Here, again, as in the case of the rule of 1855, concerning the meandering of non-navigable lakes, the fact that it but in substance formulated the practice prevailing from the beginning, is shown by the report of the Commissioner of the General Land Office made in 1877, Report, Land Office, p. 11, where, referring to the practice of the department as to surveying islands situated in navigable waters within a meander and the circular in respect thereto issued in 1868, and also referring to the circular of July 13, 1874, above referred to, it was said :

"The regulations embraced in these circulars were not new

in their substance, but were simply a formulation of the pre-existing practice of the office theretofore administered with reference to the class of lands to which they were applicable."

It is then established that from the very beginning of the government, until at least the date of the circular just referred to, the practice was, after non-navigable bodies of water had been meandered, when the beds thereof became uncovered, to dispose of such beds as the property of the United States, separately from the former border lots. As the record does not disclose the number of instances in which this practice was observed during nearly one hundred years prior to *Hardin* v. *Jordan*, I may not state them, but, as no single instance to the contrary appears, it seems to me that the statement in *Hardin* v. *Jordan*, that the contrary rule had always prevailed, is left without any support whatever, and must have arisen from confounding the uniform practice not to sell the channel of navigable rivers, which belonged to the States, with the uniform practice to the contrary as to non-navigable waters, which belonged to the United States. But, the acts of Congress on the subject are so clear that they leave no room for substantial controversy, and they, in effect, amount to a legislative approval of the construction of the laws of the United States affixed by the administrative officers to those laws from the very foundation of the government. Thus, on July 1, 1870, 16 Stat. 187, after the sale of border lots abutting on the meander of a marsh and the Little Calumet River, Congress provided for the survey and sale of the lands within the meanders. So, also, after the patenting to the State of Indiana of the fractional lots abutting on Beaver Lake, Congress, by act of January 11, 1873, 17 Stat. 409, granted the bed of the lake to the State. Again, by the act of February 19, 1874, 18 Stat. 16, the bed of a meandered lake, known as Tarkio Lake, situated in Holt County, Missouri, was conveyed to the county, with a reservation, however, that the county should make title to such person as might have settled upon any portion of the land once part of the bed of the lake, under the homestead and preëmption laws. Yet a further illustration, which, because of its brevity and importance, is ex-

cerpted in full. Congress passed an act, approved on December 21, 1874, 18 Stat. 293, which reads as follows:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That so much of the bed of the marsh or pond in sections fourteen, twenty-three, and twenty-six, in township sixteen north, of range twenty east of the fourth principal meridian, in the county of Sheboygan, in the State of Wisconsin, as shall or may be reclaimed by draining the water from the same, shall be owned and held, so far as any rights or interests of the United States are concerned, by the owners of the lands abutting upon said marsh or pond, and draining the same to the center or thread thereof, and divided among the several owners adjoining and abutting said marsh or pond, according to the rules of law, upon payment by said adjoining owners into the Treasury of the United States of one dollar and twenty five cents per acre for the amount of land that has been or may be so reclaimed."

But, it is said, although it be conceded that the patentee, under the law of the United States, was confined to the land within the actual boundaries of the fractional lots conveyed, nevertheless if, as a matter of conveyancing, a grant by an individual would be construed under the state law as extending beyond the dry land to the center of the water, such construction should be applied to the patents of the United States. This, however, but asserts the same proposition which I have already fully considered, and whilst seemingly accepting the true meaning of the law of the United States and the interpretation given to it from the beginning, proceeds to overthrow it.

To argue that because conveyances made by individuals are controlled by the law of the States, therefore conveyances made by the United States are likewise so controlled, involves, as I see it, not only a *non sequitur,* but besides amounts to denying, so far as the public domain is concerned, that there is a government of the United States having complete ownership and supreme power in the premises. The suggestion that courts as a matter of convenience will determine by the state

law the extent of a grant made by the United States is without force, since courts have no power upon their conception of convenience to deprive the United States of its property by resorting to the laws of a State in order to divest the title of the United States in and to property which it owns, and which it has never voluntarily parted with if its own laws be applied. Moreover, the argument of convenience, when inherently considered, is without merit, since it rests on the assumption that for the purpose of convenience it will be held that what property passed by a grant of the United States is to be measured by a variable standard, the divergent laws of the several States, instead of the law of the United States operating generally throughout the United States, thus creating uncertainty and confusion by causing it to come to pass that a grant made by the United States in virtue of the authority conferred by the statutes of the United States will mean one thing in one State and a wholly different thing in another.

As pointed out by this court in *Irvine* v. *Marshall,* 20 How. 558, 563, one of the very objects of the provision of the Constitution conferring ample power upon Congress with respect to the property of the United States was to prevent this very condition of things. In other words, the proposition is that for the sake of assumed convenience a rule of interpretation should be resorted to to bring about the very condition of inconvenience which it was the purpose by the constitutional provision in question to guard against.

Conceding, however, *arguendo,* that a grant by the United States should be construed as a matter of conveyancing by the local law prevailing in a particular State, it nevertheless seems to me clear that the conclusion which the court reaches is erroneous. As has been shown in the *Portsmouth Bank* case the Supreme Court of Indiana expressly decided that a conveyance of border lots by the State was to be governed, not by the rules of conveyancing applicable to private individuals, but that the power of the state officers was to be ascertained from the statutes of the State alone; consequently, it was decided that where the State had conveyed the lots abutting

on Beaver Lake by the exact description contained in the patents of the United States, such conveyances gave no right to the bed of the lake, because power existed in the officers of the State only to sell lands which had been regularly surveyed and platted. In other words, the local decisions in Indiana establish the exact distinction between the rule of conveyancing applicable to individuals and those controlling the grant by a government, which was pointed out by this court in the passage from the opinion in *Shively* v. *Bowlby*, previously quoted.

Surely, if it be the rule in Indiana that the construction of a grant made by the State of its public lands is to be controlled by the state statutes, it should not now be held that a grant by the United States of its lands situated in Indiana is not to be construed by the statutes of the United States, but by the rules of conveyancing applicable to private grants. In other words, that in dealing with the lands of the United States the government is to be subjected to the local law of Indiana and yet at the same time be deprived of the rights which are accorded by that law to the State, regarded as a government. To now so hold, it seems to me, is but to declare that it is within the province of the local law to strip the United States of its governmental attributes and reduce it to the condition of a mere private individual. This difficulty cannot be avoided by suggesting that in this particular case the Indiana courts have decided that the transfer of the border lots carried the beds of the lakes, and hence it must be construed that such land passed by the local law. As has been previously demonstrated, the decision of the Supreme Court of Indiana in this case was in effect predicated on its previous rulings in *Stoner* v. *Rice* and the *Tolleston Club* cases. In those cases it was declared that the doctrine previously announced in the *Portmouth Bank* case was not overruled, but the court proceeded upon the theory that that case was inapplicable, because it held in the subsequent cases that there had been in those cases a survey of the land under water at the time the border lots were conveyed by the United States. This was based not upon any local law, but upon the law of the United States as construed by the state court. That

construction being overthrown by the decision of this court in *Gazzam* v. *Phillips* and the many other cases in this court which have followed it, it results *that by the Federal law, upon which the court based its decision, the beds of the lakes did not pass*. And that this result was understood by the Supreme Court of Indiana is shown by the opinion on the rehearing in the *Tolleston Club* case, where it was expressly declared that if the theory of survey announced by the court was incorrect, it was its opinion that the bed of the lake did not pass and title thereto remained in the United States. The decision now announced, therefore, holds that the question whether the beds of the lakes passed is to be determined by the local law as a matter of conveyancing. When it develops by the decision of the Indiana court that under the local law, as a matter of conveyancing, the beds of the lakes did not pass it is then in effect decided that the beds did pass, because it has been decided by the Supreme Court of Indiana that there had been a survey under the law of the United States, although the fact that there had been none conclusively results from a line of decisions of this court which are not now questioned. It comes then, as my mind sees it, to this : The beds of the lakes did not pass by the local law, and they did not pass by the Federal law correctly construed ; but, although passing by neither the Federal nor the local law, they must yet be held to have passed because of a principle of law which it is impossible for me to state, because my mind does not perceive it.

Pretermitting, however, this view, and considering the case as controlled by the rule of *Hardin* v. *Jordan*, it only remains to determine whether, under the principle of *stare decisis*, my duty is to assent to its application in the case at hand. Undoubtedly, since *Hardin* v. *Jordan* was decided rights of property may have accrued predicated on the ruling made in that case, but it is also unquestionable that rights of property which had vested prior to that ruling under the acts of Congress, and the settled construction and practice of the government prevailing for almost a century would be divested if that case were applied. . Indeed, the case in hand is but an illustration of this fact, since patents of the United States to land once forming

part of the beds of the lakes which. are in controversy in this case were issued prior to the decision in *Hardin* v. *Jordan*. Two classes of rights of property then must be considered—the one resting on the true rule existing from the foundation of the government, and the other upon the mistaken theory of *Hardin* v. *Jordan*. I do not feel at liberty to indulge in the conjecture that the rights which were brought into existence during a century are less important than those which may have arisen in the comparatively short period since the decision in *Hardin* v. *Jordan*. Putting this view aside, if only, the rights of those who had actually received the patents of the United States for. the beds of the lakes which had once been meandered were concerned, it might be that I should consider it my duty to accept as controlling, under the rule of *stare decisis*, the decision in *Hardin* v. *Jordan*, and thus deprive the plaintiffs in error, whose rights are here at issue, of their property, and this upon the assumption. that the legislative department of the government would rectify the wrong which would be thus inflicted. My mind, however, cannot escape the conviction that the consequence of adhering to the doctrine of *Hardin* v. *Jordan* cannot be limited merely to the rights of those who may have in the past actually acquired from the United States title to land once forming the beds of meandered lakes. On the contrary, that doctrine strips the United States of the title to the bed of every pond or lake which was meandered during nearly a century which preceded the decision in *Hardin* v. *Jordan*, where the lots bordering on such meandered lakes had been disposed of by the United States. This shows the inadequacy of the suggestion that the United States may, by a change of the form of conveyancing, obviate the doctrine now maintained. Whatever be the change in the rules of conveyancing, whenever the bed of a meandered lake hereafter becomes fit for sale, the question must recur and call for a reiteration of the ruling now made. Under these circumstances, the line upon which I should act seems to me to have already been plainly pointed out by the court in *Gazzam* v. *Phillips*, 20 How. 372, *supra*. There the court, as I have said, having been called upon to consider the correctness of the rule announced by it twelve years

before in *Brown* v. *Clements*, 3 How. 650, and having concluded that that case had been wrongly decided, was required to determine whether it was its duty under the rule of *stare decisis* to perpetuate an erroneous principle or apply a correct one. In deciding to follow the latter course, the reason which controlled to the conclusion is so directly applicable to the subject matter of this case, and was so frankly and ably stated, that I excerpt a passage from the opinion, as follows (p. 378):

"It is possible that some rights may be disturbed by refusing to follow the opinion expressed in that case; but we are satisfied that far less inconvenience will result from this dissent, than by adhering to a principle which we think unsound, and which, in its practical operation, will unsettle the surveys and subdivisions of fractional sections of the public land, running through a period of some twenty-eight years. Any one familiar with the vast tracts of the public domain surveyed and sold, and tracts surveyed and yet unsold, within the period mentioned, can form some idea of the extent of the disturbance and confusion that must inevitably flow from an adherence to any such principle. We cannot, therefore, adopt that decision or apply its principles in rendering the judgment of the court in this case."

Concluding that the patents of the United States to the State of Indiana for the fractional lots abutting upon Wolf Lake and Lake George did not convey title to land under the water, and that the patents subsequently issued by the United States, based upon the Walcott survey of 1875, purporting to pass the title land to once a part of the beds of the lakes were valid, I dissent.

I am authorized to say that MR. JUSTICE McKENNA joins in this dissent.